Our next case of the afternoon is In re the Marriage of Moser. For the appellate Mr. Moore and the appellee Ms. McFarland you may proceed. May it please the court counsel. I'm Fred Moore. I'm here on behalf of Andreas Moser the appellate in this case. This is a case coming to you after a judgment for dissolution of marriage entered by Jed Suk in McLean County, Illinois. In the court's decision it ordered that custody of the three children of the parties, one who was a natural born, two who were adopted, go to the wife. The husband had requested the court consider joint custody order and the court declined to do that. There also was exception taken to many of the issues in identifying and distributing assets to the parties. And those are the two areas that I want to address with the court today in addition to those specifically addressed in the brief. The petitioner sought custody of the three children. The respondent asked the court to enter a joint custody order and the court ordered mother custody. And some of the court's reasoning is expressed in the transcript and if I may read briefly some of that language. He's noting that the court has authority to order joint custody and he says, Ordinarily, the situation in which you might see that happen is when the parties have agreed on joint custody but can't agree who the primary residential parent is to be. It would, in my view, take a somewhat unusual situation for the court to order joint custody when both parties are not in favor of some sort of joint custodial arrangement. The statute that allows for joint custody, and of course I remember a time when courts used to order joint custody just as a way of a sob to the non-custodial parent. It would make them feel better and it really was ordering custody and generous visitation on the other side. But now we have a statutory provision and the statute talks about upon application of either or both parents or upon its own motion, the court shall consider an award of joint custody. It goes on and talks about what joint custody means and how the court can go about determining that. Nowhere do I find in the statutory language, and I don't believe it's in there and that's why I don't find it, that it's limited to parents where both of them agree to it, they just can't agree on where the residential parent is. Isn't joint custody a terrible mistake when you have two parties that are butting heads? Instead of having a decision maker, you end up with two people who are fighting over everything. I think you're right, and you know, I recognize this court in particular has a long line of cases, most of which Appley has put in her brief, that reject awards of joint custody. And they do so not because the statute says if one or the other of you don't agree we can't do it, or if the only issue is, and only will we do it if the only issue is who's the residential parent. And if they were constantly butting heads, those are things for the court to examine. But here we have a trial court judge who starts out with saying, we don't want to do this, it's an unusual thing that we surely shouldn't consider except in unusual circumstances. Isn't this a classic case of parties butting heads? These people don't get along at all. Well, I think you're misreading the record entirely if you think that. We go back to, from the time they, there's no question their marriage was in trouble, they have problems. Does your client have some personal problems? Personal problems? Yeah. Drinking, uh... I don't think he has any drinking problems. Now, he's had, he was born and he was German, he did drink, he drank extensively, and he's been asked to quit that, and he has. That was something in the past that was part of their history. I don't think that's a problem now. Is he seeing a psychiatrist or something? He's not seeing a psychiatrist. He was diagnosed with depression and he was having some counseling. Of course, that did not prevent him and did not cause any problems with his cooperation with his wife on matters involving their children. When they separated, the first thing they did was set up a, in effect, what was a joint custody arrangement where the children were spending time with their fathers, staying overnight for two or three nights, they were there with their mother, and they were doing that voluntarily, by agreement, without any coercion by anybody. They were able to work that out. Throughout the time since their separation, they've both participated with the schools. Mother would like to claim more credit than father, but there's no question, and the record was clear, that both of them were involved in the children's school life, and their after school life, and they were getting some counseling. We have two children that were adopted, I believe Russian, and there's some suggestion that they had some particular problems that the parents were involved with them on. But, even after the judge announced his decision, he said, instead of ordering visitation, he said, why don't you guys go work it out and see if you can. And they did. And I think what really you are considering butting heads is the wife has consistently said, I want to be controlling the shots. That's the closest they've come. But when they're asked to work things out, they've been able to do so. And I think it's a characterization that the appellee would like to paint, that somehow this is insurmountable things. But the facts of what's going on in the last two or three years belies that. They are able to work together, they have worked together, and they do at the present time. We had that incident that's recorded in the briefs, where a father had the two sick boys, he took them to Myers. The one boy was not properly clothed to be out in his shoes, didn't have a jacket. Dad takes the other boy in to see the nurse practitioner. He's there longer than he expects. The other boy gets out of the car. Somebody cites him. Anyway, DCFS is called in and makes a report. Of course, they didn't tell him to do anything. They didn't require anything. But that really was not a matter of lack of cooperation of the parties. The father was able to work with the mother in that situation and other situations. He's trusted with the kids, except when mother doesn't want to trust him with the kids. I think often it's been a matter of, because of her work schedule, she's called upon him to do things that were not necessarily required. How about her testimony that it's not possible for us to be able to talk together and have the focus be the well-being of the kids? Well, she can say that, but that's not what they've been doing. Counsel, who decides that? I'm sorry? I mean, you're arguing this as if we're going to be deciding this in the first instance. She said it. It's for the trial judge to believe it or not. It looks like the trial judge believed it. So why are you even here arguing it? Because I think the trial judge started out by saying, this is not something we can order unless they're both in agreement on it. So if the trial judge hadn't started that way but that was in his fourth paragraph, he wouldn't be here? No, I think when the judge announces and verbalizes to you that he thinks that's the law and you know that's not the law, I think Justice Connick and his concurrence in Adobe made it fairly clear that perhaps the appellate courts have misled trial courts and lawyers and their clients into thinking that somehow joint parenting is something that's rare and unusual and we shouldn't be considering it when in fact the legislature has said something to the contrary. They've made provision for it and said the trial court, not you, shall consider this. The judge, in this case, after he announced that he was in custody, he did exactly what he might have done with response to the joint custody in order, and that was to say, you folks go see if you can put together a joint custody agreement. And the legislature says he can do that. If they can't do it, he's allowed to enter his own order or he can do what this judge did and that is award sole custody to one party. But once the party has requested it, normally you would expect the judge to consider it, but here we have a judge who says... He didn't consider it? He said, you know, this is not the situation... Doesn't that bespeak of consideration? Well, he considered it but because... No, your argument is he considered it and rejected it and you don't like that. Not that he didn't consider it. Well, it's because he considered it with the wrong understanding of the law. You mean that's a factor he can't take into account? Is there some case law that says that? I'm sorry. The fact that you keep humping on, that it's improper for a judge to take that into account. Is there a case that says that's an improper factor? I apologize. The first thing he said was... The trial judge? Yes. Usually the situation is when they can't agree on who the residential parent is. Okay. Is there a case that says that's an improper consideration? Oh, no, and I don't think that is, but that is not what the law says. It doesn't say... Joint parenting is for those cases where you all agree we ought to joint parent, but you can't agree on who the residential parent should be. Then we can do that. And, you know, we've gotten to a situation where this judge started out, apparently, and it's what he tells us. He thinks that this is not something that is... This is not one of those rare cases where you can have joint parenting, and yet the legislature didn't say, Well, in those rare cases you can have joint parenting. And I think it's wrong for a judge to start out with that assumption and it puts an unfair burden on my client in this case to somehow overcome that view of the law. And that's not what I think... I remember reading an article once that suggested it was very important in divorce cases for the lawyers to know which books the trial court had read. That sort of sounds like what you're saying. Where did you go to school? What things were you taught? What are your attitudes towards divorce law and joint parenting? When I got out of law school, my judges all had had Cleary for a professor, and so if you had Cleary in the evidence book in your favor, you wanted to cite Cleary. It's the same kind of thing, I suppose. And now you cite Stiglitz. I'm sure, yes. The truth is that when these parties have made efforts to work together, they've been able to do so with regard to the kids. They continued to do that and did up until the time of the trial. We're continuing to. The evidence was the children were wanting to spend more time with their father. Both parties acknowledged that. That's not really much of a controlling factor here, but I think it was apparent that the parents were able to work together. It's just that the mother said she wanted to have the final say and she wanted to be in control, and I think that's very much what this is. She's wanting power in the situation. She's got the better job. She's always had the better employment situation since they've been here. But that's not a basis for saying that she ought to have sole custody and we shouldn't consider giving the father the role of being a participant in that decision-making process with these children. If our underlying goal should be to try to keep both parents as involved in these children's lives as reasonably possible in spite of a disillusioned marriage, joint parenting is the way to do it. I think we have to quit looking, as Judge Suit did, as, well, that's pretty rare. We don't want to think about that unless it's just one of those rare situations. I think when we start out with that way, all the rest of it... Certainly, you still go and look at what else is going on, but when you do it with the prejudgment that this is not an appropriate way of going forward, I think that is an abuse of the trial judge's discretion and it should be indicated as such. Well, one, whether it's a flaw or a disadvantage to your argument, he makes these statements after he's heard all the evidence. So you may be right in that his phrasing is such that he's coming at it from a different direction than you are, but having heard all the evidence and having heard that the mother says, I believe that your client will continue to use the manner in which we parent the children to interact with me in a way that is inappropriate and to cause stress to me, and that's not going to be in anybody's best interest. I don't think we can agree, and that isn't a statement that we've never been able to agree or do something adult in the last year, year and a half, regarding trying to be fair about visitation, but this is permanent. This is for the, I mean, we assume that it's, most custody orders end up being permanent. And the reference that, well, tying it in with maintenance, one of the reasons I'm unemployed and have been unemployed is because I do suffer from depression and I do have some issues that I'm addressing with counseling or I've seen someone, and yet at the same time, I want to take this major role in parenting my children, so that I'm disadvantaged in that I can't seek full employment, but I still think that I can be essentially almost a full-time parent if you're doing joint custody, because it doesn't really cut the duties in half. It probably increases the duties of each parent because of the required level of cooperation, so I'm not sure that I buy the argument that, first of all, I don't think that Judge Soup doesn't know the law. I think he may have attitudes about joint custody that might be different than mine, but the manner in which he discusses this suggests he has taken into account all this evidence regarding the inability to cooperate fully, as would be what would be best for a joint custody order. I guess that's a speech rather than a question, but it seems to me that he's fair and he doesn't start out the case by saying, I never give joint custody, so I didn't even bother to put on any evidence. He hears all the evidence and he says this isn't an appropriate case for joint custody. I would be argued outside the record if I said he expressed surprise at the very outset of the arrangements that were going when they first showed up in court, because I think my client's point of view is he's not asking for any increase in responsibilities or duties or functions. He's wanting to continue what the parties had established when they separated, when they started, in effect, joint parenting, and he wanted to continue that. The restrictions came after the incident at the Meyers store when the court said, oh, we're going to enter a temporary custody order and supervised visits, which were, in fact, I think there was a couple of supervised visits, if you will, but the mother soon went back to the same. The children were allowed to stay overnight with their father, even though the court had not ordered that. She was not there overseeing, and she's acknowledged that as well. And what the father really wants is that situation they were starting with, which kept him more involved in the children's lives, and that's what he was asking to continue with, and that's why it's... Sure, he's not a person without problems and flaws, as I suspect all of us, if we look carefully enough, have our own situations, including the mother here, but that he was asking that it worked before, there's no reason it couldn't continue to work. Well, I'm not quite sure of the time frames, but I think one of the things that might be being said is that it's not working, if we have the incident, or it's not working the way it ought to. I think the incident at the Meyers store is pretty serious, given the age of the child, the temperature outside, and the parking lot and the number of people that flow through there. And you begin to imagine, parents would immediately begin to imagine the kinds of things that would happen, coupled with, I think, repeat incidents at the road races. Leaving children unsupervised, and saying that somebody knows that you're in the race, so somebody else is going to sort of watch the kids. That's an example of where the parties discuss that and resolve that. I guess it's part of the age, we remember a time when people could do that kind of thing, and now that's not the modern thing, I understand that. But what happened was, Mr. and Mrs. Mosher talked about that, he quit doing that, he arranged for other people to care for his kids when he was doing the road racing, well, not road racing, 5K racing. And they resolved that. It's what you expect parents to do, divorced and separated parents, and that's what they did. Well, does that mean that it's inappropriate for the court to consider the history? No, but I think it's... So then what's the problem? The characterization... You say the court, the parents discussed and resolved it as if, well, that's behind us, and that's nothing for you to think about any further, Judge. No, I didn't say that at all, I didn't mean to say that at all. What I'm saying is, I don't know that that's an example of the inability of the parents to cooperate and work with one another. In fact, they did talk to each other and resolve that matter. And I would compliment them for doing that, but I would still have serious reservations about the judgment of the person that needed to be persuaded that this is something to be worked out or resolved. One of the problems with this case and this kind of case is we start to find how many bad things we can say that the father did in his time with the kids, and then the temptation is, all right, let's look at mom. She goes off to the health club and leaves the kids home alone on several occasions. Is that a tradeoff? Should we have called DCFS and then we'd have reports on both sides? I don't know if that's healthy in a way of resolving these things, but the record has those examples of bad judgment on her side just as well. She takes the kids for a bike ride and one of them runs into a car. If that's her leadership and care of the children, maybe that's subject to complaint too. But I don't think it helps us a lot because that's not a matter just as the situation. It's not a matter of, well, they didn't cooperate and didn't work with one another. It's just that they each have had their shortcomings. I think the testimony was that the day before the second hearing, Sergei, the younger boy, was found by his father, who didn't have custody of him, biking up at the corner of Airport Road and GE Road where he was not supposed to be, actually apparently heading to his dad's house when he was supposed to be under the care of the mother or the mother's au pair living babysitter. So they've both got shortcomings and incidents that have occurred, but none of those say that, oh, you can't cooperate with one another in parenting these children. We'll hear from you on rebuttal. Is my time up? Oh, yes, the red light. I'm sorry, I'm blind on that side. That's all right. Ms. McFarland. May it please the Court, Counsel, my name is Amy McFarland, and I am here today representing the petitioner, Mother, Ms. Diane Viganick-Mosier. It's our position here today before this Honorable Court that the trial court's decision on the issues presented here on appeal should be affirmed. The difficulty in presenting this as a respondent on this case is much of what I've had to say I've prepared in my brief. However, as I was preparing and contemplating how I could present a succinct oral argument to this Court, presenting somewhat of a theme of the position in this case, it was my 7-year-old daughter who approached me today, sensing that there was something a little bit nervous about Mom today, and put everything in context. After I explained to her why I was going to Springfield, what the appellate court's job was to do, she gave me the best advice that I could have asked for. Now, mind you, she's 7 going on 37, and she is also the child of divorced parents who have never stepped foot in the courtroom. And from her little mind, she said, she gave me three reasons why she felt that our position was the right position today. She said, first of all, moms help their children to focus more on homework and on housework. Second, she said, kids want their mom when they're sick. Third, she said, kids come from their mommy's bellies and have known them longer than anyone else. She then made me promise I would not share this last bit of advice with the Court if I thought that they would laugh. Now, I recognize this is from a 7-year-old child, and I recognize it's a very generalized statement. Sounds like the 10-year-years doctrine that I don't think we can follow any longer in the state of Illinois. Understandable, and I recognize that, and this is again a perception of a child with parents of joint custody. But the point that I tie in is really a practical standpoint of how that ties into how to look at this case. And it ultimately comes down to how children, how we look at the practical issues of what is best in the best interest of children. And oftentimes it comes down to practical issues, such as who is teaching the children values, and who is there when things go wrong. On the first issue on appeal, I tie this practical advice from my daughter today to the issues at point. While counsel has indicated that he believes that the trial court did not consider the law, I believe that the trial court not only considered the law, but also considered the case law that has interpreted this statute for a period of time. Father in this case points to many situations in which the parties were able to communicate, and they were able to make agreement on the children's best interests. I would point out that most of those occasions had to do with scheduling issues. They were early in the case. We're not noting that the parents can't agree on anything. It's a very rare situation where parents can't agree on absolutely anything, although the courts do see those cases. Father points to the fact that mother was awarded sole custody, once she was awarded sole custody by the trial court, that they were able to come to an agreement. While that's somewhat outside of the record and the scope of the record on appeal, it demonstrates not necessarily the party's ability to cooperate from a joint parenting agreement, but I think what it demonstrated is mother's ability to facilitate, and her willingness to facilitate a relationship between the father and his children. I think that the flip side of that, however, is there have been many occasions where she concedes to his demands in order to maintain peace, because she knows that sometimes that's best for her children, and she did that throughout the course of these proceedings. As we look at 602.1c, the court has to look at the factors in that extraordinary ability to cooperate effectively and consistently towards best interests. I think that's where Appellant sort of gets misguided in the argument in that is not considering that the trial court did in fact look at the best interests of these children. While Mr. Mosier, in our position, he downplays the significance of the incident at Meijer. On this occasion, the child was left alone, not just without a jacket, without a coat in 19-degree weather. He swallowed a penny, and passersby are the ones who stayed with him until somebody could care for him. Judgment is a part of cooperating and being consistent in communication. My client did not know that morning that her children were not going to school, and that they were severely enough sick that they were going to a supermarket walk-in clinic. She did not know that until the school called and wondered where the children were, why they were not attending school. Had there been effective communication, it seems to me that Mr. Mosier would have picked up the phone, called her, we have a sick child, we have a child who is misbehaving, and we need to get the child some emergent medical treatment. This court has already acknowledged the trial court's, the inconsistency between Mr. Mosier's claims that he's too depressed to find a job, but is seeking greater parental responsibilities. The court specifically notes the dichotomy between these objectives. There's the drinking. While Mr. Mosier has indicated and testified at trial he had not drank for a period of time, at least during depositions, he claimed that he could drink up to 10 beers without his parenting skills being affected. From Germany, from America, I don't know. That doesn't provide me with sound judgment of parenting skills and the ability to have 10 alcoholic beverages and still maintain your children. Appellant brings up the issue that while we talk about these unsupervised races, we should also look at mom. She's left the children home alone on two occasions while she went to the gym. I think the difference in that particular situation as it relates to that judgment is, number one, mother acknowledged at the trial court level that, yes, she did. She didn't try to downplay that and say, well, the children weren't harmed. She acknowledged that she was under extreme emotional duress at the time as the parties continued to live in the marital home together, and she took full accountability and responsibility for that. Remind me, how old are the children? At the time that that occurred, I believe that they were four, I want to say four, seven, and nine. I'm not sure that that was quite a while before the trial actually occurred. But she took responsibility. She acknowledged the behavior, and it has not happened. As far as the riding the bicycles with the children when one of the children was hit, I think that we all experience situations as adults and grown-ups where, you know, we'd like to be there when the child falls off the monkey bars. We can't be perfect in the supervision of a situation when the children are with us. However, there's a difference. Mom was there at the time. She didn't push the child into the road. It was an accident, and that's all that it was. And while appellant can argue to this court that, well, nothing happened, nothing bad happened in Meijer, nothing bad has happened at these road races, but under mom's supervision, bad things have happened, really downplays the seriousness of those particular scenarios. I think that appellant argues that... We aren't talking about who should have custody here. We're talking about whether the custody should be joint custody. And it always seems to me in divorce cases, deciding custody, well, is not that difficult a situation. If you have a good parent and a bad parent, you award custody to the good one. If you have two good parents, well, that's tough. If you have two bad parents, you've got to give the custody to one or the other of them. So I'm sort of puzzled by the argument here that he wants joint custody, but he's not that good a parent. And defending Anne McConner's argument, she wants custody, but she's not a good parent either. The question is, can the two of them cooperate? And I haven't heard any indication yet that they can. And that would be our position on this. I think that while the appellant argues in his brief that the court shouldn't consider the domestic violence issues that arose between this couple, I think that it is particularly illustrative to the court that because there have been these instances of throwing glass, kicking a door, and him acknowledging that, yeah, he knew that what he was doing was going to cause her extreme emotional duress. And, yes, he did acknowledge that he had anger issues. And that as a result of that, as a result of that inequity or imbalance of power between them, yes, she does have concerns that he cannot bring the best interests of the children to the table to cooperate effectively. And that his vision is on her and how to undermine her. We have an issue when she is parenting the child who has behavioral problems and he picks up a lighter, she directs him to dispose of it, and instead father says, oh, don't worry about it, I'll show you how to light it later. Again, that doesn't show a cooperation. That shows a complete undermining of her parenting. I guess I would liken the facts of this to In Re Marriage of McCoy, where in that case the mother clearly said they were able to get along so long as she gave in to his desires. And I think that a lot of those issues are at play in this particular case. By the way, let me ask you about that because I think Justice Cook's point is an excellent one and that's where our focus ought to be. You had mentioned earlier about how maybe one of the reasons that there wasn't more strife was because, and I'm paraphrasing you now, your client went along with circumstances that she didn't like just to avoid strife and creating difficulties. I'm not sure if that was, for lack of a better way, just your suggestion of the situation or was that, in fact, affirmative evidence testified to you before Judge Suquid made this decision? Well, I think as Mr. Moore talked about how the parties came to a visitation agreement after sole custody was determined somewhat off the record on appeal, I think that indication as to how that agreement came along is somewhat of my interpretation of how that order came to be and how that agreement came to be. So we don't have any definitive testimony either way? I don't think so, Your Honor. Because the reason I ask that is that would be pretty significant. That's exactly the kind of stuff that, you know, rejecting a joint custody arrangement, I think a judge or the trial judge would want to hear that, sure, I can get along with this guy if I go along with his demands and not concede on points that I think he's wrong on. That's not exactly getting along. I do think that there was some testimony after the DCFS indication that the court had ordered supervised visitation, wherein my client could come to the home and supervise the visitation. There was some testimony that she discontinued that because it was awkward, it was uncomfortable, the parties did not have other people or other support systems in the community that would be able to supervise that visitation, and there was somewhat of a relenting on her part as it related to that particular situation. I think that the case law is particularly instructive here. Mr. Moore argues that joint custody, he wants joint custody, he doesn't really want more responsibility, he doesn't really want more time, he wants more active participation. Well, joint custody does not create a level of participation. He creates the level of participation that he wants to have with his children. Sole custody or joint custody are labels in that regard. He has access to school records. There's nothing precluding him from talking to doctors, to talking to teachers. He testified himself he's only participated and attended less than a handful of his children's basketball games. He testified that he goes to chess tournaments now only because it used to be that when he dropped them off, the parents were a little bit displeased with the situation. A little bit what? They were displeased that he just dropped his children off and left. And so from that standpoint, that has nothing to do with joint custody. That has nothing to do with how he chooses to participate, how he chooses to be involved with their activities at their school. And he's not precluded from any of that with a joint custody. I think what he's looking for is more mom to, he wants to communicate more with mom because there is sort of this dysfunctional relationship that continues to occur with them. And to me that falls more into his lap as to how much activity he wants to have. I think he's very comfortable allowing her to make the decisions. She has kept him in the loop. She has invited him to parent-teacher conferences as it relates to their youngest child's academic issues. He has been asked to participate in counseling similar to the middle child's behavioral issues. So he has not been disinvited as sometimes we see with mothers or fathers who have sole custody where they try to shut the other parent out. That hasn't been the case in this. But at the end of the day, we have poor judgment on numerous occasions and a dichotomy of their ability to communicate. And at the end it comes back to each party's values. And somebody needs to be the decision maker and set the tone for the appropriate behavioral standards, for the appropriate values of these children. And unfortunately father just, they're not to that level of cooperation. That is all I have on joint custody. I know that there was not any discussion by Mr. Moore on the property issues. If I may just take a moment and I would just indicate that on those remaining issues, from our standpoint it's a little bit difficult to justify some of the arguments on that end in that Mr. Mosher presented very limited financial or property evidence at court. And it can be very easy to stand in the position of I didn't provide any evidence, however I can criticize the evidence that the other side has provided. I can tell you that it's routine in a pretrial order, final pretrial order in McLean County, that the courts have ordered inventory of assets and liabilities to be provided so that they can look at each side's proposed values and equalization proposals. And in fact I haven't tried a property case that hasn't had one of those. It's not intended to be evidence. My client testified to each and every one of the property issues that was addressed in the inventory. There was very little cross-examination of her. There was almost no rebuttal evidence as to any of the values related to that. So from our standpoint we feel that to a large extent there was a waiver of many of those issues raised in the appeal. As to the maintenance, I don't believe that it was known to the court, to the attorneys until the day of trial that Mr. Mosher was actually seeking an award of maintenance. Again, he testified that for approximately two and a half years he'd been too depressed to even look for a job. He continued to maintain unemployment. And our position is that he testified that he did not believe he would be able to make as much money as his wife. However, that was pure speculation. He didn't provide any information as to his job class, what type of salaries that job class is in, and provided little value. Further, as to the maintenance issue, there was no evidence that showed that he had foregone any educational or professional opportunities in order to further her career. And for those purposes, we believe that the court was correct in its interpretation and its division of the marital property and its denial of maintenance. Thank you. Thank you. Mr. Moore, rebuttal. Thank you. I apologize that I ran out of time originally. I would have talked about some of the financial issues. They are addressed in the brief. We do have a funny situation there. Judge Sue, for some reason, did not enter an order calling for an inventory. I was familiar that often that is called for, and it wasn't in this case. And when one did show up, the judge made it clear that that's not evidence, that's not an exhibit, that's just a proposal. And then he proceeded to take all the values off of it, including values that were not supported by the evidence. For example, you have this in the record. Although initially it wasn't in the record, I had to go back to the clerk because they didn't do this as an exhibit either, and so it didn't show up initially as a supplement to it. You didn't have a copy of it before the trial? I got it at the trial, as I recall. There had been an earlier one, and then they had submitted one because of some car values and the like. A lot of the exhibits that were offered were matters that we had produced in discovery and the like, and so it's not like we had not produced things and we don't do them twice. But I think the brief addresses the fact that they applied values that just don't make sense, that are incorrect, and I don't want to deal with it much more because we don't have much time. But I think those were concerns that I hope you will address. Your argument was there was a piece of property in Germany that he had a mortgage on. Right. How evidence did he present of that? The same document that they used to present the value, which was in discovery response interrogatories, here's what the property is for the mortgages, here's the amount of the mortgage. That's exhibit 39, I think, is the exhibit. It has both the value that's used by the judge for the value of the property and it has the mortgage. They're both listed there. The judge chose to ignore those, but I don't think he ignored them. I think he just looked at the non-exhibit inventory and picked those values out. Did you object to him looking at the inventory? Did you object to it? I objected to its admission, and there is that assurance in the record from the court. This is just a proposal. That's the words that the judge used. Because when he asked if there were objections to exhibits, there weren't objections to exhibits, and I raised that this, except for this, and he said, well, that's not an exhibit, that's a proposal. What evidence did you present as to the mortgage on the German property? The value that's found in exhibit 39, which is where we get the value for both the property and the mortgage, which I don't have the numbers in front of me, but it was, I think it was, both values were given in euros, and the plaintiff has used. And that's the same as on the inventory? Same numbers as on the inventory? Well, there is no mortgage listed on the inventory. It's on the exhibit itself, which is referenced on the inventory, however. Exhibit 39 had both values in it, as stated in euros. And you don't think the judge took this exhibit into account? Well, it's very clear he didn't take into account there was a mortgage. He put a value of $152,000, I believe is the correct one, that he used, and didn't consider the mortgage that's on the property. Briefly, let me say that Mr. Mosher has participated in decisions about health care. He has played a part in these kids' lives, contrary to what counsel has argued. I think the Meyer incident, he'd emailed the mother earlier that morning, like at 1 or 2 o'clock in the morning, that the kids, the two boys were sick, and they were going to be out of school, so she was in the loop. Now, he didn't tell her, I'm taking them in to see a nurse. But certainly, within the 12-hour period before this happened, he had been in communication with her, and he did regularly. They're modern people, they use email. I think the record reflects that the mother doesn't want to agree to a joint agreement, doesn't want to cooperate, but her actions are contrary to that, because they did cooperate, and do cooperate. Even after this, the kids are with Dad for periods of time. She trusts him to leave them with him for as much as a week at a time. So it's contrary to what she's saying, that her actions are different. And I think it's because she doesn't want to have joint custody, but doesn't give a good reason. What would an order of joint custody do that he doesn't already have? It would allow him to have some say in the training and upbringing of the children that he doesn't have right now, as far as their living conditions and the like, medical decisions. I think he has cooperated in the past with her on that, but she's chosen religiously. But you said he's doing well with visitation and all that. Why isn't that good news? Well, what visitation he has, he is. Any other questions? No other questions. Thank you.